## GORDON *v.* THE MANCHESTER & LAWRENCE RAILROAD.

The publication of a time-table, in common form, imposes upon a railroad company the obligation to use due care and skill to have the trains arrive and depart at the precise moments indicated in the table ; but it does not import an absolute and unconditional engagement for such arrival and departure, and does not make the company liable for want of punctuality which is not attributable to their negligence.

G. purchased of the M. & L. R. R. a season ticket from S., an intermediate station, to M.   The railroad company published a time-table, in common form, upon which a train was advertised as leaving L. at 8:27 A. M., leaving S. at 8:45, and arriving at M. at 9:35 A. M.   G. was at S. depot in season to take this train, but the train ran by S. without stopping.   In an action of assumpsit, brought by G. against the railroad company to recover damages for their failure to transport him seasonably to M., the railroad company offered to prove that the road was suitably equipped for transporting the usual travel, and for accommodating the excess ordinarily to be anticipated from extraordinary occasions; that, on the morning in question, an extraordinary, unusual, and unexpected number of persons appeared at L. to take passage, and there, and at other stations before reaching S., so completely filled and overloaded the cars that it would have been dangerous to have admitted more passengers on the train ; that at S. there were, besides the plaintiff, a large number of persons waiting for transportation, whom it would have been impossible to have taken into the already overloaded cars; that the railroad company could not have discriminated as to whom they would take or decline to take, even if they had had the means to transport any of them ; that the train consisted of eighteen passenger cars and one baggage car, and

that, if the train had stopped at that station, being on an up grade, it would have been impossible to have started it; that the railroad company had no reason to expect that such an unusual number of persons would apply for transportation on that morning; and that, on the arrival of the train at M., and as soon as the same could be done with safety to the travelling public, they sent back the train to S. to bring the plaintiff, and all other persons desiring transportation, to M.

*Held*, that the railroad company were not liable, if they had done all that due care and skill could do to transport the plaintiff punctually; and that the proposed evidence was admissible, as tending to show that the failure to transport the plaintiff was not attributable to negligence on the part of the railroad company.

ASSUMPSIT, by George C. Gordon against the Manchester & Lawrence Railroad. The declaration alleged in substance that the defendants, in consideration of a payment of twenty dollars, promised the plaintiff to transport him between Salem, N. H., and Manchester, N. H., by the regular trains between said Salem and Manchester, for the space of three months, ending Sept. 30, 1870 ; that on Sept. 8, 1870, the plaintiff was at Salem station, ready and anxious to be transported in the regular morning train to Manchester, but that the defendants neglected and refused to stop at Salem station the train due there, and which arrived there at 8.52 A. M. that day, and neglected and refused to transport the plaintiff to Manchester by the train aforesaid, or in any other manner, during the forenoon of that day.

Plea, the general issue, with a brief statement.

The plaintiff testified that he purchased a ticket of the defendants, on or about July 1, 1870, of which the following is a copy:

"Manchester & Lawrence Railroad. Season ticket. Pass George C. Gordon for three months, ending Sept. 30, 1870, between Salem and Manchester.            CHAS. E. TWOMBLY, G. T. A."

The plaintiff testified that he was at Salem station on the morning of Sept. 8 ready to take the morning train, but that said train did not stop at Salem, and that he did not arrive at Manchester until two o'clock in the afternoon.

The plaintiff having rested, the defendants moved for a nonsuit. The motion was denied, and the defendants excepted.

The defendants then offered to prove the facts stated in the brief statement, as follows: "That said defendants have at all times before, and on the said Sept. 8, 1870, and since, supplied said railroad with a good and sufficient number of suitable cars and locomotives for transporting the usual and regular travel on said road, and for accommodating the excess ordinarily to be anticipated from extraordinary occasions. That on said September 8, when the plaintiff alleges that he was not taken by the morning train, an extraordinary, unusual, and unexpected number of persons appeared at Lawrence to take passage on the train, and there, and at Methuen and Messer's, so completely

filled the passenger and baggage cars as to occupy all the seats, fill the aisles and platforms, and otherwise overload the cars, so that it would have been ·dangerous to have admitted more passengers on the train ; that at said station of Salem there was, besides the plaintiff, a large number of persons—to wit, one hundred—waiting for transportation, whom it would have been impossible to have taken into the already overloaded cars, and it would have been dangerous to the safe transportation of the passengers already on the train to have permitted any of the persons at the said station of Salem to get on board, and that the defendants could .not have discriminated as to whom they would take or decline to take, even if they had had the means to transport any of them ; that the defendants were common carriers, and were and are bound to receive and carry all persons asking transportation, so far as their means would allow, and had no right to refuse transportation because they anticipated that at some other station there might be other persons also claiming transportation ; and that the defendants had no reason to expect that such an unusual number of persons would apply for transportation on the morning of the said Sept. 8 ; and that the defendants, on the arrival of the train in Manchester, and as soon as the same could be done with safety to the travelling public, sent back the train to said Salem to bring the plaintiff, and all other persons desiring transportation, to Manchester, which was all that said defendants were bound to do in law."

The defendants also offered to prove that the train consisted of eighteen passenger cars and one baggage car, and that, if the train had ·stopped at that station, being on an up grade, it would have been impossible to have started it.     .

The evidence offered was all excluded ; and the defendants excepted.

The court charged the jury that the defendants were liable for not carrying the plaintiff, and that it made no difference by what means they were prevented from fulfiling their contract.

The jury returned a verdict for the plaintiff.  The defendants moved to set aside the verdict ; and the questions thus arising were reserved for the law term.

At the law term the defendants conceded that during the entire year 1870 they published a time-table, in the usual form, upon which a train was advertised as leaving Lawrence at 8 : 27 A. M., leaving Salem at 8 : 45, and due at Manchester at 9 : 35 A. M.

*Marston,* for the plaintiff.

*S. C. Eastman* and *G. C. ·Bartlett,* for the defendants.

SMITH, J.  In order to decide whether the evidence offered by the defendants was rightly rejected, it is indispensable to determine what the contract was.   If the defendants entered into an absolute and unconditional engagement to transport the plaintiff to Manchester at the precise hour and minute named in the time-table, the ruling of the

court was correct. If, on the other hand, the defendants only engaged to do all that due care and skill could do to insure punctuality, a different result may follow.

A common carrier of passengers is a person upon whom the law imposes particular obligations; " and all persons are supposed to deal with the carrier on the terms which the law predetermines, unless they specially provide otherwise." "A particular arrangement is determined by a provision of the law, subject to be altered by a special convention between the parties." Where the contract is in general terms, or is not expressed in words at all, and there are no external circumstances indicating the intention of the parties that the carrier should assume more or less than his ordinary liability, the contracting parties are regarded as tacitly adopting and incorporating into their contract the common law provisions relative to the obligations and liabilities of common carriers of passengers. It would be an idle ceremony for the parties to go through the form of uttering words which " express no more than the law by intendment would have supplied."

By the common law, common carriers of passengers are bound to use due care and skill to transport passengers safely and promptly ; but they are not insurers of results ; they are not held liable as absolute warrantors of safety or speed. The burden of proof rests on the party asserting that the carriers entered into an engagement more onerous than that which the common law imposes on them. We have now to inquire what circumstances there are, in the present case, to indicate that the defendants assumed so much more than their common law liability as to become absolute warrantors of punctuality.

The plaintiff paid his fare in advance.

This is nothing more than what the great majority of passengers do, without any idea that the carriers are thereby made to incur any unusual responsibility. Nor does it appear that the plaintiff understood that his payment in advance for the season gave him any especial preference over passengers who had paid in advance for a single passage. It is not suggested that season passengers were charged an extra price. In all probability, each trip cost the plaintiff a much smaller average sum than if he had paid single fares.

The plaintiff had a ticket.

It has been said by this court that " ordinarily the ticket is not and does not contain the contract." *Johnson* v. *Concord R. R.*, 46 N. H. 213, p. 219. And it has been asserted that a ticket is rather in the nature of a receipt for the passage money,—" a mere token or voucher adopted for convenience, to show that the passenger has paid his fare from one place to another." DENIO, J., in *Quimby* v. *Vanderbilt*, 17 N. Y. 306, p. 313 ; EARL, Com., in *Rawson* v. *Penn. R. R. Co.*, 48 N. Y. 212, p. 217. Certainly, the ticket now in question does not purport to express, and does not express, all the terms of the contract. If this were held otherwise, the plaintiff might find it difficult to make out even a *prima facie* case. Looking only at the literal language of the ticket, and considering it as the sole and conclusive evidence of the

terms of the contract, it might be said that the plaintiff has had all that the ticket entitled him to, namely, a passage to Manchester. The ticket does not specify that trains shall run at reasonable hours, or with reasonable dispatch, much less that they shall run at regular and fixed hours. It is obvious that neither party can fairly be asked to regard the ticket as expressing all the terms of the contract. There is nothing in this ticket to indicate that the contract was an unusual one, or made upon any other basis than the common law obligations of carriers. It was unnecessary that the ticket should express in words what the law tacitly implies. "*Expressio eorum quæ tacite insunt nihil operatur.*" (For instances of contracts in general terms, which are construed as containing implied conditions exonerating a party who is without fault, see *Dexter* v. *Norton*, 47 N. Y. 62, note to *Hall* v. *Wright*, 96 Eng. Com. Law, p. 795, *Robinson* v. *Davison*, L. R. 6 Exchq. 269; *Taylor* v. *Caldwell*, 3 Best & Smith 826;—also, L. R. 4 C. P. 1 *ib.* 744.)

The defendants had published a time-table, upon which a train was advertised as leaving Lawrence at 8 : 27 A. M., leaving Salem at 8 : 45 A. M., and due at Manchester at 9 : 35 A. M.

Undoubtedly, "the representations made by railway companies in their time-tables cannot be treated as mere waste paper." Lord CAMPBELL, C. J., in *Denton* v. *Great Northern Railway Co.*, 5 El. & Bl. 860, p. 865. It must be conceded that such a public advertisement at least imposes on the defendants the obligation of using due care and skill to have their trains arrive and depart at the times thus indicated. For any want of punctuality which they could have avoided by the use of due care and skill, they are unquestionably liable. Nor can they excuse a non-conformity to the time-table for any cause, the existence of which was known or ought to have been known to them at the time of publishing the table. "They make the time advertised a criterion of ordinary reasonable time." The publication of the time-table cannot amount to less than this, viz., a representation that it is ordinarily practicable for the company, by the use of due care and skill, to run according to the table, and an engagement on their part that they will do all that can be done by the use of due care and skill to accomplish that result. Does it go beyond this? Does it amount to an absolute and unconditional engagement that the trains shall arrive and depart at the precise moments indicated in the table? Does it make the company warrantors or insurers of punctuality, and liable for delays which are due, not to their fault, but to pure accident?

If these questions are answered in the affirmative, a very singular result will follow. Railroad companies will be under a much more onerous obligation to run punctually than to run safely. They may, then, on the same state of facts, be held liable for the loss of an hour's time, and not liable for the loss of a year's time or for the loss of a limb. As to safety, they are bound only to use due care and skill to attain it. They are not liable for mishaps which are not attributable to their negligence. *Readhead* v. *Midland R. Co.*, L. R. 4 Q. B. 379,

p. 381. Suppose the morning train had reached Salem " on time," taken the plaintiff on board, and proceeded towards Manchester ; that midway between Salem and Manchester the train had been thrown from the track in consequence of the breaking of a wheel ; that such breakage was caused by a latent defect which could not have been previously detected ; that the plaintiff by this accident lost a limb, and was permanently incapacitated for labor ; and that, after some delay, the plaintiff and the other passengers were carried on by another train, so that they reached Manchester three hours late on the same day : in such a case, it is clear that the defendants are not liable to the plaintiff for the bodily injury, nor for his loss of time after reaching Manchester. Does it not seem extraordinary that they should be liable for the loss of the three hours' time, when they are not liable for the loss of the three years' time since elapsed, or for the loss of the limb ? Is it natural to suppose that the parties understood the obligation to carry speedily, to be more rigid than the obligation to carry safely ? A large proportion of passengers might consider the latter obligation the more important of the two, and might prefer delay to death. It is not now suggested that the defendants could not impose upon themselves a liability in respect to punctuality, far in excess of their obligations in other respects. But, in considering whether they have done so, the incongruous nature of such action on their part may be entitled to some weight. We should naturally expect the party alleging such action to offer very explicit evidence of it. The case is unlike that of a charter-party. There, the parties enter into a written agreement which, presumably, expresses all the terms of the contract. If, in such an agreement, it is stipulated that the ship shall sail on or before a particular day, there may be no good reason for giving this express stipulation any other than a strictly literal construction, or for implying conditions or limitations not named in the writing. See *Glaholm* v. *Hays*, 2 Man. & Gr. 257 ; *Croockewit* v. *Fletcher*, 1 Hurl. & Norm. 893. In the present case, there is no formal contract, either written or oral. The great inquiry is, What was the contract ? The nature of the contract is to be gathered from various documents and circumstances. The time-table is only one among several pieces of evidence, from all of which, taken all together, the contract is to be inferred.

The importance of punctuality is undeniable, but so is the importance of safety. The serious results of a failure in either respect may be weighed in determining whether the carriers have used due care and skill; but the importance of success does not furnish conclusive evidence that the company have absolutely guaranteed against failure. Moreover, the known difficulty of attaining absolute punctuality throughout a whole year may be taken into account as a sort of off-set to the argument founded on the importance of punctuality. This difficulty may diminish the probability that the company would assume such a rigorous obligation. In *Howard* v. *Cobb*, 19 Monthly Law Reporter 377, the contract related only to a single trip of a steamer. But here, there is no ground for asserting that the defendants made

any different agreement relative to their morning train on September 8, so far as punctuality is concerned, from that entered into respecting all their other regular trains throughout the whole year. Practically, the question is, whether they have undertaken to guarantee exact punctuality in the arrival and departure of all their trains throughout a whole year. We are not reduced to the dilemma of considering the time-table as evidence of such a guaranty, or else giving it "no meaning and effect at all." As has already been intimated, much effect can be given to it, as increasing the obligations of the defendants, without construing it as an absolute warranty of punctuality.

Upon the whole, we think that there is no evidence that the defendants entered into an absolute and unconditional engagement that the trains should depart and arrive at the precise moments indicated in the time-table. The defendants were not liable for the failure to carry the plaintiff in the morning, unless that failure was attributable to their negligence, to their neglecting to do all that due care could do to run in conformity to the time-table. The rejected evidence tended to show that the failure was not attributable to their negligence. It should, therefore, have been received, and submitted to the consideration of the jury.

An examination of reported decisions does not disclose any strong preponderance against the views now expressed. In most cases, the negligence of the carrier has been proved or admitted.

*Hawcroft* v. *Great Northern R. Co.*, as sometimes cited, might seem strongly against the defendants; but, as reported, its bearing in that direction is not so obvious. It is a case decided by PATTESON, J., and WIGHTMAN, J., in the Queen's Bench, in 1852, and is reported in 16 Jurist 196, 8 Eng. Law & Eq. 362, and more fully in Law Journal, vol. 30, N. S., vol. 21, Qu. B. 178. The plaintiff purchased an excursion ticket from Barnsley to London and return. Upon the back of the ticket were the words, "to return by the trains advertised for that purpose on any day not beyond fourteen days after date hereof." The defendants advertised certain trains for excursion ticket holders, including one train leaving London at 6.45 A. M. on Saturday, and another at 9.15 P. M. Upon all the facts, the court seem to have concluded, and we think correctly, that the plaintiff had a right to understand that both trains were advertised as carrying through to Barnsley. The plaintiff went to the London station as early as 6 A. M. on Saturday; but the pressure of persons wishing to be passengers by that train was so great that he was unable to obtain a seat in it, although it consisted of thirty carriages drawn by two engines. The company caused an extra train of twenty-three carriages to be sent about noon, but this train was also filled without the plaintiff's being able to procure a place. The company made every exertion to procure and send off another extra train during the day, but were unable to do so for want of sufficient engines, carriages, and servants at the London station to meet the extraordinary influx of returning excursion passengers on that morning, although they were sufficiently supplied for the ordi-

nary excursion traffic of the company. The defendants contended that it would have been unsafe to have dispatched the 6.45 A. M. train with more than two engines, or with a greater number of carriages ; but it was conceded that a sufficient number of trains to convey all excursion ticket-holders might have been dispatched with safety long before noon, if the company had been provided with a sufficient number of engines, cars, and servants for the purpose at the London station. It was claimed that the transportation provided would have been sufficient to accommodate all applicants on any other Saturday morning for two months, and that the number of applicants on the Saturday morning in question was greater than on any other Saturday. The plaintiff took passage in the 9.15 P. M. train, which carried him only as far as Doncaster. No arrangement had been made for carrying him thence to Barnsley, and no train ran thither until Monday. The county judge, at the trial, ruled that there was a special contract binding the defendants to carry the plaintiff by the 6.45 A. M. train, or by some other train within a reasonable time after that hour ; that carrying by the 9.15 P. M. train was not a sufficient compliance with the contract, but, if so, there was a breach in carrying no farther than Doncaster ; that the extraordinary influx of passengers was no defence, but the company were bound to provide sufficient accommodations at or within a reasonable time after the hour advertised for all excursion ticket-holders. In arguing to set aside the verdict for the plaintiff, rendered under these rulings, the counsel for the defendants said,—" Could the company be sued if they had refused to carry a passenger when there was no room for him ? They were common carriers, and bound to carry safely." Thereupon, Patteson, J., remarked,—" They should have made it a condition of their contract that they would not carry unless there was room." The court refused to grant a new trial. Patteson, J., said,—" The defendants, in refusing to take the plaintiff by the morning train, were right, because the train was too full to allow him to be carried with safety. But if they put him off and kept him until the evening, they should have made some special provision for carrying him on to Barnsley at once. I do not think that they had any right to keep him in London until the 9.15 evening train. They should have sent another train. The case finds that they might have done so without danger." Wightman, J., said,—" * * * * * I think that by going by the evening train he has waived any right to complain of having been kept until the evening. But if he was content to wait and go by the evening train, he ought to have been carried on as far as Barnsley, unless they had told him what the state of the case was with respect to the stopping at Doncaster, or had made some special terms with him."

In that case it is clear that the company were liable, at all events, for failing to make any attempt to carry the plaintiff through to Barnsley by the evening train. Wightman, J., rests his decision entirely on this, and it is questionable whether the case can be regarded as an authority for anything beyond this. The county judge at the trial seems

to have ruled that the defendants complied with their contract if they carried the plaintiff within a reasonable time after the hour advertised. This is all that the defendants can ask in the case at bar. It means "reasonable under all the circumstances of the case;" and such a ruling is inconsistent with the theory of an absolute guaranty of punctuality. The *dictum*, and the decision of PATTESON, J., may be susceptible of the construction that the company had failed to use due foresight to anticipate and provide for the emergency, and that they were liable on that ground. We think that the case cannot be regarded as an authority entitled to controlling weight in the present instance (see 2 Redf. on Railways, 5th ed., p. 281); and we have stated it thus fully, not so much by reason of its intrinsic importance, as on account of the frequency with which it has been cited elsewhere.

Other cases will be noticed more briefly. In *Sears* v. *Eastern R. R. Co.*, 14 Allen 433, the company were liable for not using due care to give notice of the change in the starting time of the train. In *Lafayette R. R. Co.* v. *Sims*, 27 Ind. 59, the company did not attempt to show that they had used due care to provide accommodations. They demurred to the replication, instead of rejoining that there was an unexpected rush of passengers which they could not reasonably have anticipated. *Dunlop* v. *Edin. & Glasg. R. Co.*, 16 Jurist, part 2, 407, 408, was a case where the company were clearly in fault. In *Denton* v. *Great Northern R. Co.*, 5 El. & Bl. 860, the defendants were liable for falsely representing that a train would start when they knew it would not. There was no attempt on their part to comply with the advertisement. *Weed* v. *Panama R.R. Co.*, 17 N. Y. 362, is a case where the delay was held chargeable to the fault of the defendants, on the principle that the act of their servant was their act;—see, also, *Blackstock* v. *N. Y. & Erie R. R.*, 20 N. Y. 48. In *Deming* v. *Grand Trunk R. R. Co.*, 48 N. H. 455, it appeared that, on February 21, the plaintiffs told the defendants that they had wool to send to Boston, which had been contracted for and which they were very anxious to have go forward immediately, and that, unless it could be sent forward from Northumberland the next day, it must go by another railroad route. The defendants thereupon received the wool, and agreed to forward it from Northumberland on February 22, but did *not* forward it until March 16. The defendants offered to show that, owing to the approaching termination of the reciprocity treaty, there was at this time a great and unusual rush of freight, and that this occasioned the delay. They did not offer to prove that the rush commenced after the making of their contract with the plaintiffs, or that the plaintiffs had knowledge of it. The evidence was rejected. (See the ruling on p. 461.) That case differs from the present in at least two vital particulars;—First: the special stress laid on punctuality in the negotiation tended to show an absolute contract to carry within a prescribed time, and the jury found such a contract. See *Harmony* v. *Bingham*, 12 N. Y. 99; *Wilson* v. *York, Newcastle & Berwick R. Co.*, 18 Eng. Law & Eq. 557, in note; MULLIN, J., in *Van Buskirk* v. *Roberts*, 31 N. Y. 661, pp. 674, 675.

Second : the existence of the alleged cause of delay was, for aught that appeared, fully within the knowledge of the defendants at the time they contracted with the plaintiffs.   They were in fault for knowingly undertaking more than they could perform.   See 17 Mo. 290.   In *New Orleans, &c. R. Co.* v. *Hurts*, 36 Miss. 660, the company offered no excuse whatever for running past the station ; and, in *Heirn* v. *M' Caughan*, 32 Miss. 17, there was evidence tending to show want of due effort to stop. In *Strohn* v. *Detroit & Mil. R. R. Co.*, 23 Wis. 126, it seems to have been held that a mere statement by the carrier's agent that the ordinary time for transportation of freight is a certain number of days, is not sufficient to show a contract to carry within that time.   In Angell on Carriers, 4th ed., sec. 527 *a*, it is said that the time-tables are " in the nature of a special contract, so that any deviation from them renders the company liable ;" but we think no authority there cited, unless it be *Hawcroft* v. *G. W. R. Co.*, directly sustains this position.

It would seem that the English railway companies are now in the habit of inserting notices in their time-tables that they do not warrant that the trains will arrive and depart at the precise time indicated. See BOVILL, C. J., in *Lord* v. *Midland R. Co.*, L. R. 2 C. P. 339, p. 345 ; *Hurst* v. *Great Western R. Co.*, 19 C. B. (N. S.) 310 ; *Prevost* v. *Great Eastern R.*, 13 Law Times, N. S. 20 ; *Buckmaster* v. *G. E. R. Co.*, 23 Law Times, N. S. 471.   But this practice may have been adopted from abundant caution, and does not seem to us to furnish decisive evidence of the understanding of the legal profession that the time-table, without the notice, would import a warranty.   In this country nearly all the railroads publish time-tables, and delays, not attributable to negligence, are not uncommon ; yet suits to recover damages for detention in such cases are almost, if not quite, unknown. That such actions are almost unprecedented, " shows very strongly what has been understood to be the law upon the subject."

The motion for a nonsuit was properly denied ; for the jury might have found negligence from the (then) unexplained evidence that the train ran by Salem.   The new trial is granted, because of the rejection of the evidence which the defendants offered, to explain this circumstance.                                                          *Verdict set aside.*